IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ZACHARY LUTZ,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **RAKUTEN, INC.,** *et al.,* | : | **No. 17-3895** |
| *Defendants.* | : | |

## OPINION

### I.   INTRODUCTION

In this Motion to Dismiss, the Court must decide whether it has personal
jurisdiction over Defendants, Rakuten, Inc. ("Rakuten"), a Japanese corporation
and holding company, and its direct and wholly owned subsidiary, Rakuten
Baseball, Inc. ("Rakuten Baseball"), a Japanese corporation, and whether Plaintiff
adequately stated plausible claims for relief under Fed. R. Civ. P. 12(b)(6).

### II.   BACKGROUND

#### A. Factual Background

##### 1. *The Relevant Parties[1]*

Plaintiff, Zachary Lutz, a former professional baseball player, played for the
Tohoku Rakuten Golden Eagles (the "Golden Eagles") in 2014.  ECF No. 1 at ¶ 1;

---

[1] Rakuten's CEO and Chairman of the Board, Hiroshi Mikitani, was originally a Defendant in
this matter, however, he was voluntarily dismissed by Plaintiff on January 11, 2019.  ECF No.
40.

1

Although Plaintiff never played for a team that allowed him live in his hometown during the season, Plaintiff has continuously maintained a Pennsylvania residency, including when the played for the Golden Eagles in 2014. ECF No. 44-1 at ¶ 4.

The Golden Eagles are a professional baseball team that plays in Japan's Pacific League, one of two professional baseball leagues in Nippon Professional Baseball in Japan. ECF No. 42-3 at ¶ 4. Rakuten Baseball owns and operates the Golden Eagles. *Id.* Rakuten Baseball is a Japanese corporation headquartered in Sendai, Japan. *Id.*

Rakuten is a Japanese corporation headquartered in Tokyo, Japan. ECF No. 42-2 at ¶ 3. Rakuten is a holding company that has more than 70 businesses constituting its corporate family that are spread across 30 countries and regions around the world. *Id.* Rakuten Baseball is a direct, wholly-owned subsidiary of Rakuten. *Id.* at ¶ 8. Rakuten does not have any direct, wholly-owned subsidiaries located in Pennsylvania. *Id.* at 10.

### 2. *The 2015 season contract negotiations*

During the 2014 season, Plaintiff fractured his thumb while playing for the Golden Eagles. ECF No. 1 at ¶ 36. Because of the injury to his thumb, Plaintiff returned to his permanent residence in Pennsylvania in mid-September 2014. ECF No. 44-1 at ¶ 3. Sometime in late September 2014, Plaintiff had surgery at the Weill Medical College of Cornell University in New York, New York to repair his

2

injured thumb. ECF No. 1 at ¶ 37, Exhibit 2. After the thumb surgery, Plaintiff was receiving physical therapy in Pennsylvania for his thumb from October 27, 2014 through November 26, 2014. ECF No. 44-1 at ¶ 8.

While Plaintiff was recovering from his thumb injury, he and his agents (who are with MVP Sports Group, located in Los Angeles, California) began discussions and negotiations with Golden Eagles' representatives regarding a new contract for Plaintiff to play for the Golden Eagles during the 2015 season, and potentially beyond. *Id.* at ¶¶ 34-35. Plaintiff and his agents, during these initial discussions, communicated with Akihoto Sasaki ("Sasaki"), Special Assistant to the Golden Eagles' General Manager. *Id.* at ¶ 34. Because of Plaintiff's thumb injury, the negotiations primarily focused on the healing process of Plaintiff's thumb. *Id.* at 36. Plaintiff represents that between September 23, 2014 and November 19, 2014 there were 41 separate emails sent between himself and Sasaki. ECF No. 44 at 1-4. All of these emails either dealt with the healing of Plaintiff's thumb or the negotiations for a new contract for the 2015 season. *Id.* These communications, according to Plaintiff, virtually all took place while he was in Pennsylvania, with the "most frequent and intense communications" between October, November, and December taking place while he was in Pennsylvania. ECF No. 44-1 at ¶ 7. Plaintiff also represents that he and Sasaki communicated via

3

text message throughout the Fall of 2014, while he was in Pennsylvania, regarding negotiations and his thumb's medical condition. *Id.* at ¶ 9.

On November 4, 2014, Sasaki emailed Plaintiff to inform him that the Golden Eagles decided to enter into a new contract with him for the 2015 season and sent an offer to him, summarizing the terms. ECF No. 44 at 3. Then, between November 17, 2014 and November 19, 2014, Plaintiff and Sasaki exchanged emails regarding the terms of the November 4, 2014 contract proposal. *Id.* On November 19 and thereafter, Plaintiff's agents began communicating with Sasaki via email regarding the proposed contract. *Id.* On November 27, 2014, Sasaki emailed a revised 2015 contract to Plaintiff in Pennsylvania and to Plaintiff's agents. *Id.* Moreover, on November 27, 2014, Sasaki called Plaintiff in Pennsylvania to congratulate him that they were able to come to an agreement for a new contract for the 2015 season. *Id.* Thereafter, Plaintiff's agents and Sasaki finalized the 2015 contract and Plaintiff received a copy of the finalized contract from the Golden Eagles on December 6, 2014. ECF No. 1 at ¶ 50. Plaintiff signed the contract at his residence in Pennsylvania, scanned the signature page, and returned the signed contract to the Golden Eagles that same day. *Id.* This contract guaranteed Plaintiff a base salary of $700,000.00, incentive bonuses based on Plaintiff's performance on the field, and reimbursement for expenses. ECF No. 44-1 at ¶ 14. On December 9, 2014, Plaintiff sent the Golden Eagles a letter from

4

his physical therapist stating that he has full functional use of his right thumb and has been cleared for all baseball activities. ECF No. 1 at ¶ 51. Relying on the guaranteed base salary in the 2015 contract that he signed on December 6, Plaintiff and his wife purchased a home in Berks County, Pennsylvania. ECF No. 44-1 at ¶ 14.

On December 12, 2014, Sasaki ceased communications with Plaintiff and his agents and they now dealt with Hiroshi Abei ("Abei"), the Golden Eagles' Director of Player Development. ECF No. 44 at 3. On December 16, 2014, Abei informed Plaintiff and his agents that the Golden Eagles would not sign the 2015 contract that Plaintiff signed on December 6, 2014. ECF No. 1 at ¶ 53. On December 19, 2014, Abei called Plaintiff's agent to inform him that the Golden Eagles intended to renegotiate the terms of the contract that Plaintiff signed. *Id.* at ¶ 55. On December 24, 2014, Abei emailed Plaintiff's agent to inform him that the Golden Eagles had decided to cease negotiations with Plaintiff regarding a contract for the 2015 season. *Id.* at ¶ 57. Plaintiff was then released from the Golden Eagles' "Reserve List" on January 5, 2015, allowing Plaintiff and his agents to speak with other teams (in Japan and elsewhere) about potential contracts for the 2015 season.[2] *Id.* at ¶¶ 55, 58. Due to the timing of when Plaintiff was released

---

[2] While Plaintiff was on the Golden Eagles' "Reserve List" he was unable to communicate with other professional baseball teams about potential contracts.

5

from the "Reserve List," Plaintiff was forced to sign a contract with the Doosan Bears of the Korean Baseball Organization for a salary of $550,000.00. *Id.* at 59. This contract was worth $150,000.00 less than his guaranteed base salary under the terms of the 2015 contract with the Golden Eagles and did not include incentive bonuses and expenses that Plaintiff would have received under the 2015 contract with the Golden Eagles. *Id.*

## B. Procedural Background

This matter was initiated by way of a Complaint filed by Plaintiff on August 30, 2017. ECF No. 1. On November 30, 2017, Defendants filed their first Motion to Dismiss. ECF No. 11. On September 11, 2018 the Honorable Jeffrey L. Schmehl denied Defendants' Motion to Dismiss without prejudice and allowed the parties to conduct jurisdictional discovery for a period of 60 days. ECF No. 23. After the completion of jurisdictional discovery, the Defendants were allowed to renew their Motion to Dismiss. *Id.* On November 26, 2018, this matter was transferred to the undersigned Judge. ECF No. 30. On November 29, 2018, after Plaintiff moved to extend the jurisdictional discovery deadline, the Court granted Plaintiff's Motion to Extend Jurisdictional Discovery Deadline and extended the discovery deadline to January 3, 2019. ECF No. 35.

After a status conference on January 10, 2019, the Court ordered Defendants to file their renewed Motion to Dismiss no later than January 25, 2019 and for

Plaintiff to respond within 30 days of receipt of the Motion to Dismiss. ECF No. 41. On January 25, 2019, Defendants filed their Motion to Dismiss pursuant to Rule 12(b)(2) and (6) that is currently before the Court. ECF No. 42. Plaintiff filed his Response to Defendants' Motion to Dismiss on February 11, 2019. ECF No. 44. Defendants filed a Reply on February 15, 2019 and Plaintiff filed a Sur-Response on February 17, 2019. ECF Nos. 45 and 49, respectively.

## III. DISCUSSION

First, this Court must determine whether it has personal jurisdiction over Defendants. Then, if the Court does have personal jurisdiction, it must determine whether Plaintiff has stated plausible claims for relief.

### A. Personal Jurisdiction

There are two types of personal jurisdiction: general and specific. If personal jurisdiction is challenged, the plaintiff bears the burden of establishing that personal jurisdiction exists. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 316 (3d Cir. 2007). Because the Court did not hold an evidentiary hearing, Plaintiff, here, "need only establish a prima facie case of personal jurisdiction" and is entitled to have all "allegations taken as true and all factual disputes drawn in [his] favor." *Id.* Unlike a Rule 12(b)(6) motion, the Court's review of a Rule 12(b)(2) motion is not limited to the face of the pleadings and the Court may rely on sworn affidavits submitted by the parties or other competent evidence that

supports jurisdiction. *Patterson by Patterson v. F.B.I.*, 893 F. 2d 595, 603-04 (3d Cir. 1990).

Pursuant to Fed. R. Civ. P. 4(k), a district court typically exercises personal jurisdiction according to the law of the state where it sits. *Id.*; *see* Fed. R. Civ. P. 4(k)(1)(A). Therefore, because this Court sits in the Commonwealth of Pennsylvania, it must apply the Pennsylvania long-arm statute. Pennsylvania's long-arm statute provides for jurisdiction "based on the most minimum contact with th[e] Commonwealth allowed under the Constitution of the United States." *O'Connor*, 496 F.3d at 316 (alteration in original) (internal quotations omitted) (quoting 42 Pa. Cons. Ann. § 5233(b)). Accordingly, this Court must decide whether Defendants have "certain minimum contacts with . . . [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (alteration in original) (internal quotations omitted) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "The nature of these contacts must be such that the defendant should be reasonably able to anticipate being haled into court in the forum state." *Provident Nat. Bank v. California Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987).

### 1. *Traditional Specific Jurisdiction*

Defendants argue that this Court lacks specific personal jurisdiction over both Defendants. Traditionally, courts apply a three-pronged test to determine

whether specific jurisdiction exists. *O'Connor*, 496 F.3d at 317. First "the
defendant must have 'purposefully directed [its] activities' at the forum." *Id.*
(alteration in original) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 472
(1985)). There must be a "deliberate targeting of the forum" and "contacts with a
state's citizens that take place outside the state are not purposeful contacts with the
state itself." *Id.* Moreover, "the defendant must have 'purposefully avail[ed] itself
of the privilege of conducting activities within the forum.'" *Id.* (alteration in
original) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). However,
"[p]hysical entrance is not required." *Id.* "In assessing whether a commercial
entity has availed itself of the privileges of a forum's laws, jurisdiction is proper if
the defendant has taken 'action . . . purposefully directed toward the forum state.'"
*Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 370 (3d Cir. 2002) (alteration in
original) (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S.
102, 112 (1987) (plurality opinion of O'Connor, J.)).

Second, "the litigation must 'arise out of or relate to' at least one of those
activities" that was purposefully directed at the forum. *O'Connor*, 496 F.3d at 317
(quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414
(1984)). This "analysis should hew closely to the reciprocity principle upon which
specific jurisdiction rests." *Id.* at 323. "With each purposeful contact by an out-of-
state resident, the forum state's laws will extend certain benefits and impose

9

certain obligations. Specific jurisdiction is the cost of enjoying the benefits." *Id.*
(internal citation omitted). This relatedness element must maintain the
"jurisdictional exposure that results from a contact closely tailored to that contact's
accompanying substantive obligations. The causal connection can be somewhat
looser than the tort concept of proximate causation, but it must nonetheless be
intimate enough to keep the quid pro quo proportional and personal jurisdiction
reasonably foreseeable." *Id.* (internal citation omitted). Notwithstanding the
above, courts must be cognizant that the "arise out of or relate to" requirement
does not have a "specific rule because [the Third Circuit has] approached each case
individually and taken a 'realistic approach' to analyzing a defendant's contacts
with a forum." *Miller Yacht Sales Inc. v. Smith*, 384 F.3d 93, 100 (3d Cir. 2004)
(quoting *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d
Cir. 1992)).

　　Third, and finally, courts "may also consider whether the exercise of
jurisdiction otherwise 'comport[s] with fair play and substantial justice.'"
*O'Connor*, 496 F.3d at 317 (alteration in original) (quoting *Burger King*, 471 U.S.
at 476.). When minimum contacts are met, jurisdiction is presumptively
constitutional, "and the defendant 'must present a compelling case that the
presence of some other considerations would render jurisdiction unreasonable.'"
*Id.* at 324 (quoting *Burger King*, 471 U.S. at 477). When analyzing this third

element, the Supreme Court has identified several factors for courts to consider. These balancing factors include: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate [and international] judicial system's interest in obtaining the most efficient resolution of controversies, and the procedural and substantive interests of other nations." *Id.* (alteration in original) (internal quotations and citations omitted) (quoting *Burger King*, 471 U.S. at 477; *Asahi Metal Indus. Co.*, 480 U.S. at 113).

Generally, courts are directed to evaluate specific jurisdiction on a claim-by-claim basis. *Id.* at 317 n. 3. However, for "certain factually overlapping claims" courts need not evaluate specific jurisdiction on a claim-by-claim basis. *Id.* In the instant matter, Plaintiff has alleged fraud, negligent misrepresentation, and promissory estoppel. These three causes of action are all dependent on the same set of facts and they represent "the total, compensable damages [directly] . . . suffered as a result of the principal plaintiff's injury"; therefore, the claims do not need to be analyzed separately. *Id.* (internal quotations omitted) (quoting *Scattaregia v. Wu*, 343 Pa. Super. 452, 492 A.2d 55, 553 (1985)).

### i. Specific Jurisdiction Over Rakuten Baseball

Plaintiff alleges that "[v]irtually all of the negotiations for a 2015 contract with defendants took place in Pennsylvania" after he returned to Pennsylvania in

11

September 2014. ECF No. 44-1 at ¶ 7. The Court finds that it has specific personal jurisdiction over Rakuten Baseball. First, Rakuten Baseball, by way of its representatives, purposefully directed its activities at Pennsylvania. During negotiations for a 2015 contract, Rakuten Baseball representatives directly communicated with Plaintiff via email and text messages while he was in Pennsylvania. Sasaki also communicated with Plaintiff via a telephone call on November 27, 2014 to congratulate him on resigning with the Golden Eagles for the 2015 season.

Rakuten Baseball was also aware that Plaintiff was a Pennsylvania resident. For instance, Rakuten Baseball wire transferred Plaintiff's salary for the 2014 season to his bank account in Pottstown, Pennsylvania, which included Plaintiff's buyout of his 2014 contract. *Id.* at ¶ 12. Rakuten Baseball also paid Aetna Insurance Company for the medical insurance for Plaintiff's physical therapy and rehabilitation of his injured thumb, most of which took place in Pennsylvania. *Id.* Moreover, taking Plaintiff's allegations as factually true, it is clear that Rakuten Baseball knowingly reached into Pennsylvania to recruit and employ Plaintiff to play baseball for the Golden Eagles. These are all examples of Rakuten Baseball taking action that was purposefully directed at Pennsylvania.

Second, this litigation clearly arises out of Rakuten Baseball's contacts with Plaintiff while he was in Pennsylvania. These contacts in Pennsylvania are the

crux of Plaintiff's claims against Rakuten Baseball. The majority of these communications/contacts Rakuten Baseball knew, or had reason to believe, were taking placing while Plaintiff was in Pennsylvania. Third, the Court's exercise of personal jurisdiction over Rakuten Baseball supports notions of fair play and substantial justice. This matter being heard in Pennsylvania creates a substantially smaller burden on Rakuten Baseball compared to the burden Plaintiff would face if this Court would not hear this matter. Rakuten Baseball is a sophisticated corporation that has the resources to defend this matter in Pennsylvania. The relative finances of Rakuten Baseball compared to Plaintiff's finances is an overwhelming factor that supports the Court's exercise of personal jurisdiction over Rakuten Baseball.[3]

## ii. Specific Jurisdiction against Rakuten

This Court cannot exercise personal jurisdiction over Rakuten under the three-pronged traditional specific jurisdiction test. Even assuming Rakuten has purposefully directed its activities at Pennsylvania,[4] there are no allegations, and nothing in the record suggests, that this litigation arises out of Rakuten's contacts with Pennsylvania. This litigation concerns negotiations over a baseball contract,

---

[3] Because Rakuten Baseball is subject to personal jurisdiction under traditional specific jurisdiction, the Court does not reach the question of whether Rakuten Baseball is subject to personal jurisdiction on Plaintiff's fraud claim under the *Calder* effects test. *See Miller Yacht Sales*, 384 F.3d at 96 n. 2.

[4] The Court only assumes that Rakuten has purposefully directed its activities at Pennsylvania for its specific jurisdiction analysis.

13

and Rakuten's alleged contacts with Pennsylvania do not concern Plaintiff's claims. Moreover, there are no allegations that Rakuten's contacts with Pennsylvania in any way affected the negotiations between Plaintiff and Rakuten Baseball.

Likewise, the *Calder* effects test does not establish personal jurisdiction over Rakuten on Plaintiff's fraud claim.[5]  When an intentional tort is alleged and personal jurisdiction cannot be established through the traditional specific jurisdiction test, courts apply the *Calder* effects test, derived from *Calder v. Jones*, 465 U.S. 783 (1984). *IMO Industries, Inc. v. Kiekert AG*, 155 F.3d 254, 260 (3d Cir. 1998). Under the *Calder* effects test, a plaintiff can demonstrate personal jurisdiction if he shows:

(1) The defendant committed an intentional tort;

---

[5] Plaintiff argues that negligent misrepresentation is considered an intentional tort and should be analyzed under the *Calder* effects test. ECF No. 44 at 16. However, the Pennsylvania Supreme Court in *Gibbs v. Ernst* noted the difference between negligent misrepresentation and the intentional tort of intentional misrepresentation by stating that "negligent misrepresentation differs from intentional misrepresentation in that to commit the former, the speaker need not know his or he words are untrue, but must have failed to make reasonable investigation of the truth of those words." 538 Pa. 193, 647 A.2d 882, 890 (1994) (citing Restatement (Second) of Torts § 552). Moreover, Plaintiff did not cite to any authority that supports his contention that negligent misrepresentation is an intentional tort. Similarly, Plaintiff's contention that promissory estoppel is also analyzed under the *Calder* effects test is equally unfounded. This Court has found no case, nor has Plaintiff alleged any case, which states that, under Pennsylvania law, promissory estoppel is an intentional tort. *Schley v. Microsoft Corp.*, 2008 WL 5075266, at *5 (D.N.J. Nov. 24, 2008), cited by Plaintiff in support of his contention, simply states that, under New Jersey law, a "claim for promissory estoppel is distinct from a contract claim and is more analogous to a tort." Plaintiff's cause of action alleging fraud is the only intentional tort that is before the Court.

14

(2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort;

(3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007) (citing *IMO Industries*, 155 F.3d at 265-66). Standard specific jurisdiction and the *Calder* effects test may differ analytically, although, "they are cut from the same cloth." *Id.* The effects test requires a similar type of intentionality on the part of the defendant and "prevents a defendant from being haled into a jurisdiction solely because the defendant intentionally caused harm that was felt in the forum state if the defendant did not expressly aim his conduct at that state." *Id.* (citing *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 455 n. 6 (3d Cir. 2003)).

When reviewing jurisdiction under the *Calder* effects test, courts must first consider the "expressly aimed" element. *IMO Industries*, 155 F.3d at 260. Only when that is met do courts consider the other two elements. *Marten*, 499 F.3d at 297. To establish the "expressly aimed" element, a plaintiff is required to demonstrate that "the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." *Id.* at 298 (internal quotations omitted) (quoting *IMO Industries*, 155 F.3d at 266).

15

In the instant matter, there is nothing in the record to suggest that Rakuten "expressly aimed its tortious conduct at the forum." In fact, there is no evidence that Rakuten, as a holding company, aimed any of its conduct at Pennsylvania that is connected to the facts giving rise to this litigation. Furthermore, Plaintiff has not demonstrated or adequately pled that Rakuten, by itself, has committed an intentional tort against Plaintiff. Plaintiff's allegations for fraud all speak to Rakuten Baseball and its representatives' conduct, nothing goes to Rakuten's actual conduct (other than the allegation that Rakuten Baseball is a direct subsidiary of Rakuten). Plaintiff does not cite any case that holds that a court can exercise personal jurisdiction against a parent holding company under the *Calder* effects test simply because there are allegations that the subsidiary committed an intentional tort. Accordingly, the *Calder* effects test does not confer personal jurisdiction on this Court over Rakuten. Because the Court cannot exercise personal jurisdiction against Rakuten under specific jurisdiction, it will next discuss whether personal jurisdiction can be exercised under general personal jurisdiction.

### 1. *General Jurisdiction*

Under general jurisdiction, the Court's inquiry related to Rakuten "is whether that corporation's 'affiliations with the State are so continuous and systemic as to render [it] essentially at home in the forum State.'" *Daimler AG v.*

*Bauman*, 571 U.S. 117, 137 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). The contacts necessary to establish general jurisdiction need not relate to the plaintiff's cause of action. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 334 (3d Cir. 2009). However, a corporation's "continuous activity of some sorts within a state . . . is not enough to support the demand that the corporation be amendable to suits unrelated to that activity." *Goodyear*, 564 U.S. at 927 (internal quotations omitted) (quoting *Int'l Shoe*, 326 U.S. at 318). "The nonresident's contacts to the forum must be continuous and substantial." *Provident Nat. Bank*, 819 F.3d at 437. When foreign corporations are sued, "the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'" *Daimler*, 571 U.S. at 137 (alterations in original) (quoting Lea Brilmayer, et al., *A General Look at General Jurisdiction*, 68 TEX. L. REV. 721, 735 (1988)).

In the instant matter, Plaintiff has not demonstrated that Rakuten has continuous and systemic affiliations with Pennsylvania that would essentially render it at home in Pennsylvania. Rakuten is a Japanese corporation holding company that is headquartered in Japan. Plaintiff has not shown that Rakuten, as a holding company, sells any goods or services in Pennsylvania, has any locations in Pennsylvania, or directly targets and solicits Pennsylvania citizens. Plaintiff's

evidence[6] in support of Rakuten's contacts with Pennsylvania that support general jurisdiction are too attenuated and do not render Rakuten at home in Pennsylvania.

i. *Personal Jurisdiction Based on the Operation of a Web Site*

Plaintiff, in his Complaint, makes multiple references to Rakuten, and Rakuten-affiliated, websites, indicating that Plaintiff is attempting to confer jurisdiction upon Rakuten through those websites. ECF No. at ¶¶ 9-15. Plaintiff does not include any link or citation to the websites that he is referring to in his Complaint; however, in the parties' briefings and attachments for the instant Motion, there are references to three websites that are all affiliated with the Rakuten brand and potential jurisdiction over Rakuten. They include: (1) https://global.rakuten.com ("global.rakuten.com"), *see generally* ECF No. 42-5; (2) https://rakutenmarketing.com ("rakutenmarketing.com"), *see generally id.*; and (3) https://rakuten.com ("rakuten.com"), *see generally id.* According to Defendants, global.rakuten.com provides information about the Rakuten brand. *Id.* Rakutenmarketing.com is owned and operated by Rakuten Marketing LLC, which is not a subsidiary or owned by Rakuten. *Id.* at 56. Rakuten Commerce, LLC, d/b/a rakuten.com, is a Delaware limited liability company headquartered in San

---

[6] Plaintiff's evidence in support of his contention that Rakuten targets Pennsylvania includes: 1) an advertisement for the company, Ebates, in Pennsylvania that states that Ebates is a "Rakuten Company"; and 2) Rakuten's logo being displayed on the jerseys for the Golden State Warriors, an NBA team, was a direct promotion to fans in Philadelphia when the Golden State Warriors played the Philadelphia 76ers in Philadelphia on November 11, 2017. ECF No. 44 at 18-20.

Mateo, California. *Id.* at 59. Rakuten Commerce, LLC provides an online platform where third-party sellers can market their products to consumers, consumers that can potentially be living in Pennsylvania. *Id.* at 59-60. However, Defendants represent that Rakuten Commerce, LLC is not a direct, wholly owned subsidiary of Rakuten and Rakuten has no operation oversight concerning Rakuten Commerce, LLC's operations or business. *Id.* at 59.

The seminal case of *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997) lays out when it is permissible for a district court to exercise personal jurisdiction based on a defendant's website. *Zippo* instructs courts that a "sliding scale" should be employed with the principles of personal jurisdiction. "At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper." *Id.* at 1124. "At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction." *Id.* "The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is

19

determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Id.* The standard set forth in *Zippo* is followed in other circuits. *See Mink v. AAAA Development LLC*, 190 F.3d 333, 336 (5th Cir. 1999) (following *Zippo's* categorization of websites' interactivity levels into three categories). Although *Zippo* was analyzed under specific jurisdiction and did not discuss the imposition of a website for general jurisdiction purposes, the framework established in *Zippo* is used for general jurisdiction analyses. *See Molnlycke Health Care AB v. Dumex Medical Surgical Products Ltd.*, 64 F. Supp. 2d 448, 451 (E.D. Pa. 1999).

Courts, after analyzing a defendant's website's interactivity level, next look to two factors for whether a defendant's website resulted in sufficient contacts with the forum to establish general jurisdiction. *Snyder v. Dolphin Encounters Ltd.*, 235 F. Supp. 2d 433, 440 (E.D. Pa. 2002). "First, [whether] the defendant's websites were not 'targeted' specifically to reach out to Pennsylvanians." *Id.* (citing *Molnlycke Health Care*, 64 F. Supp. 2d at 452). "Second, [whether] the plaintiff failed to demonstrate that the websites were 'central' to the defendant's business in Pennsylvania." *Id.* (citing *Molnlycke Health Care*, 64 F. Supp. 2d. at 452); *see In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation*, 735 F. Supp. 2d 277, 315-16 (W.D. Pa. 2010) ("'Where a website is interactive and general jurisdiction is at issue, the court must analyze whether the website is

targeted specifically to Pennsylvanians and whether the website is central to the defendant's business in Pennsylvania.'" (quoting *Muller v. Sunshine Rest. Merger Sub LLC*, 2009 WL 1107263, at \*3 (M.D. Pa. Apr. 23, 2009))). Courts are reluctant to find general jurisdiction where a defendant establishes a website in which customers can order products from, without a showing of continuous and systemic affiliations with the forum to establish the defendant is essentially at home in the forum. *See Jacobs v. Halper*, 116 F. Supp. 3d 469, 478 (E.D. Pa. 2015) ("Plaintiff has provided no facts to show that Grey Flannel Defendants have 'systemic and continuous' contacts with Pennsylvania through its website, let alone contact substantial enough for the Court to find that the Grey Flannel Defendants are 'essentially at home' in Pennsylvania."); *Molnlycke Health Care*, 64 F. Supp. 2d. at 451 (holding that "the establishment of a website through which customers can order products does not, on its own, suffice to establish general jurisdiction"). The Court in *Molnlycke*, following the *Zippo* factors, found that "[t]o hold that the possibility of ordering products from a website establishes general jurisdiction would effectively hold that any corporation with such a website is subject to general jurisdiction in every state." *Molnlycke*, 64 F. Supp. 2d at 451.

Therefore, when a website is alleged to confer general jurisdiction upon a defendant, courts must first use the *Zippo* categories to determine the interactivity level of the website and whether customers can purchase goods directly from the

defendant's website. Second, if the interactivity level of the website is sufficient to the point where it is more than a passive website, the court must next determine whether the plaintiff has shown that the defendant specifically targets the website to citizens in the forum and whether the website is central to the defendant's business in the forum. If plaintiff has satisfied these factors, the court has personal jurisdiction over the defendant by virtue of the defendant's website.

In the instant matter, of the three websites mentioned in the parties' briefs, affidavits, and other competent evidence pertaining to Defendants' Motion to Dismiss, the only website that is operated by Rakuten is global.rakuten.com. *See* ECF No. 42-5 at 51 (responding to Plaintiff's assertion that the "Rakuten Ecosystem" described on global.rakuten.com asserts personal jurisdiction, Rakuten's Supplemental and Amended Responses to Plaintiff's First Set of Interrogatories on Jurisdiction [attached to Defendants' Motion to Dismiss] states that, "[w]hile Rakuten, Inc. does describe a 'Rakuten Ecosystem' on *its website* . . ." (emphasis added)). This website, according to the *Zippo* categories, is simply a passive website that only provides information to customers and users. The website is more akin to an advertisement of the overall Rakuten brand that provides information on every aspect of the Rakuten brand. Although the website has links that directly takes users to other Rakuten-affiliated websites, such as the Golden Eagles' website or to rakuten.com, this only fosters interactivity between

those websites and Pennsylvania citizens, not between Pennsylvania citizens and Rakuten. *See In re Enterprise*, 735 F. Supp. 2d at 316. Furthermore, the website is not central to Rakuten's business because Rakuten is a holding company, and as a holding company, it does not provide any services or sell any goods to Pennsylvania citizens. *See id.* ("The website is not central, however, to ERAC-Missouri's business, since ERAC-Missouri is a holding company that provides administrative services to its operating subsidiaries, but does not rent automobiles. For similar reasons, the significant interactive features of the website foster interactivity between Pennsylvania residents and the operating subsidiaries, and not between Pennsylvania residents and defendant parent."). Therefore, this Court does not have personal jurisdiction over Rakuten via its website.

The second website at issue, rakutenmarketing.com, falls into the middle *Zippo* category, that is, it allows users to exchange information with the host. For instance, a user can contact the host by submitting their email address, company telephone number, company URL, and information about their company. This information is provided to the owner of the website, Rakuten Marketing LLC, to allow Rakuten Marketing LLC to send information related to the commercial relationship between the user/customer and Rakuten Marketing LLC. Although this website is interactive, nothing in the record suggests that this website specifically targets Pennsylvania citizens or that this website derives substantial

this website by clicking on links to third party websites. By ordering an item from that third-party website, the user will receive "cash back" to their rakuten.com account. Every quarter, rakuten.com sends the "cash back" earned to the user in the form of a check or a PayPal payment. This website is clearly highly interactive, allows users to enter into contracts with rakuten.com, and repeatedly transmits computer files.

Although these websites are interactive, nothing in the record suggests that these websites specifically target Pennsylvania citizens or derive substantial revenue from Pennsylvania citizens. Moreover, there is nothing in the record to suggest that these websites are central to Rakuten's business as a holding company. However, for purposes of Defendants' Motion, the Court will assume that these websites target Pennsylvania citizens and are central to Rakuten's business. With this assumption, the Court will next address whether the companies that control these websites or Rakuten Baseball impute personal jurisdiction over Rakuten by way of the alter-ego theory.

ii. *Personal Jurisdiction Imputed on a Parent Corporation*

A court exercises personal jurisdiction over a parent corporation through its personal jurisdiction over a subsidiary by way of the alter-ego theory. Under the alter-ego theory, if a subsidiary is "merely the agent" of its parent corporation or the parent corporation "controls" the subsidiary, "then personal jurisdiction exists

over the parent whenever personal jurisdiction (whether general or specific) exists over the subsidiary." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 781 (3d Cir. 2018); *see also Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 300 (3d Cir. 2008) ("To obtain general jurisdiction over Chevron in Pennsylvania based on Texaco's contacts, [plaintiff] would need to show that Chevron controls Texaco."). "Ultimately, a plaintiff must show that a parent company is operating the 'day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent.'" *Britax Child Safety, Inc. v. Nuna Int'l B.V.*, 321 F. Supp. 3d 546, 555 (E.D. Pa. 2018) (quoting *Oeschle v. Pro-Tech Power, Inc.*, No. 03-6875, 2006 WL 680908, at \*5 (E.D. Pa. Mar. 15, 2006)). Courts in this district consider ten factors to determine whether a subsidiary is the alter ego of the parent:

(1) ownership of all or most of the stock of the related corporation; (2) common officers and directors; (3) common marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) integrated sales system; (7) interchange of managerial and supervisory personnel; (8) performance by the related corporation of business functions which the principal corporation would normally conduct through its own agent or departments; (9) acting of the related corporation as marketing arm of the principal corporation, or as an exclusive distributor; and (10) receipt by the officers of the related corporation of instruction from the principal corporation.

*Neopart Transit, LLC v. CBM N.A. Inc.*, 314 F. Supp. 3d 628, 645 (E.D. Pa. 2018) (citing *Simeone ex rel. Estate of Albert Francis Simeone, Jr. v. Bombardier-Rotax*

*GmbH*, 360 F. Supp. 2d 665, 675 (E.D. Pa. 2005); *In re Latex Gloves Products Liability Litig.*, 2001 WL 964105, at *3-4 (E.D. Pa. Aug. 22, 2001)).

Here, even assuming this Court has personal jurisdiction over Rakuten Marketing LLC and Rakuten Commerce, LLC, by way of rakutenmarketing.com and Rakuten.com, respectively, it cannot exercise personal jurisdiction over Rakuten through the alter-ego theory in relation to these two websites. Plaintiff did not plead that Rakuten controls these companies or that these companies are the agents of Rakuten. Further, the record does not establish that Rakuten controls Rakuten Marketing LLC and Rakuten Commerce, LLC, pursuant to the principles required under the law. *See Shuker*, 885 F.3d at 781; *Kehm Oil Co.*, 537 F.3d at 300. Plaintiff also did not produce any evidence to refute Rakuten's assertion that Rakuten Marketing LLC is not a subsidiary or owned by Rakuten and that Rakuten Commerce, LLC is not a direct, wholly owned subsidiary of Rakuten.

Second, the ten alter-ego factors support the conclusion that these companies cannot be the basis for personal jurisdiction over Rakuten. Of these factors, only two support alter-ego, and they include, the common use of a marketing image and logo. There is no evidence that Rakuten directs these companies and instructs them how to perform. These companies' functions are also not normal functions that Rakuten would perform, *as a holding company*. Finally, Plaintiff has not shown that Rakuten owns all or most of the stock of these companies and there is

no suggestion that there is an interchange in the managerial and supervisory personnel between Rakuten and these companies. In all, there is simply no indication that Rakuten is essentially running the day-to-day operations of these companies (or their websites). Therefore, this Court cannot exercise personal jurisdiction over Rakuten via the alter-ego theory by way of Rakuten Marketing LLC and Rakuten Commerce, LLC.[7]

Next, the Court has already held that it has specific personal jurisdiction over Rakuten's subsidiary, Rakuten Baseball.[8] Therefore, to impute personal jurisdiction over Rakuten under an alter-ego theory, Plaintiff must show that Rakuten sufficiently "controls" Rakuten Baseball. This is simply not the case, here. At most, Rakuten and Rakuten Baseball use the same Rakuten logo for branding purposes; Rakuten owns all the shares of Rakuten Baseball, *see* ECF No. 42-2 at ¶ 21; and third, the Golden Eagles act as a marketing tool for the Rakuten

---

[7] In his argument that Rakuten is subject to personal jurisdiction in this District, Plaintiff relies on Rakuten's own global "ecosystem" concept. However, there is no case law to support Plaintiff's position that a global company, such as Rakuten, that promotes itself globally is subject to personal jurisdiction in any state in which its advertisements may land. There is no law to support that a global holding company bootstraps itself into personal jurisdiction merely by proclaiming to the world that it is a holding company for a complex of Rakuten companies it does not otherwise control pursuant to the alter-ego theory.

[8] Although Plaintiff states in his Response to Defendants' Motion to Dismiss that Rakuten Card LLC is registered as a foreign corporation in Pennsylvania, thereby consenting to this Court's general jurisdiction, that contention is absent from Plaintiff's Complaint and Plaintiff did not attach any affidavits or documents authenticating that Rakuten Card LLC is registered as a foreign corporation. Therefore, the Court cannot look at Rakuten Card LLC as a vehicle to impute personal jurisdiction over Rakuten via the alter-ego theory. Alternatively, Plaintiff has not alleged any facts or submitted any evidence which demonstrates that Rakuten controls Rakuten Card LLC for alter-ego purposes.

27

brand. However, Rakuten is not involved in the operation of the Golden Eagles and does not make any baseball-related decisions. There is simply no evidence that Rakuten actually "controls" the day-to-day operations of Rakuten Baseball. Furthermore, Rakuten is only associated with professional baseball through the Golden Eagles. Rakuten is a holding company and the operation of a baseball team is not a normal function/activity that would be conducted by a holding company of primarily e-commerce companies. Therefore, this Court does not have personal jurisdiction over Rakuten by way of the alter-ego theory.

B. Personal Jurisdiction Conclusion

Based on the foregoing, this Court has personal jurisdiction over Rakuten Baseball through traditional specific jurisdiction, but this Court lacks personal jurisdiction over Rakuten. Therefore, Rakuten is dismissed from this matter.

C. Failure to State a Claim

Because this Court has determined that it has personal jurisdiction over Rakuten Baseball, it will next discuss whether Plaintiff has sufficiently stated plausible claims for relief under Fed. R. Civ. P. 12(b)(6) against Rakuten Baseball.

When reviewing a motion to dismiss under Rule 12(b)(6), the Court "accept[s] as true all allegations in plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and [the court] construes them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422,

426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 557). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786-87 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

Finally, courts reviewing the sufficiency of a complaint must engage in a three-step process. First, the court "must 'take note of the elements [the] plaintiff must plead to state a claim.'" *Id.* at 787 (alterations in original) (quoting *Iqbal*, 556 U.S. at 679). "Second, [the court] should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Third, "'[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Id.* (alterations in original) (quoting *Iqbal*, 556 U.S. at 679).

### 1. *Statute of Limitations*

First, Rakuten Baseball argues that Plaintiff's fraud and negligent misrepresentation claims are barred by the statute of limitations. Because negligent misrepresentation and fraud are claims brought under Pennsylvania law, the applicable statute of limitations for these claims is two years. *See* 42 Pa. C.S.A. § 5524(7). Pennsylvania's discovery rule may toll the accrual of the statute of limitations "when a plaintiff is unable, 'despite the exercise of due diligence, to know of the injury or its cause.'" *Mest v. Cabot Corp.*, 449 F.3d 502, 510 (3d Cir. 2006) (quoting *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 468 A.2d 468, 471 (1983)). Under the discovery rule, "even if a plaintiff suffers an injury, the statute of limitations does not begin to run until 'the plaintiff knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct.'" *Id.* (quoting *Debiec v. Cabot Corp.*, 352 F.3d 117, 129 (3d Cir. 2003)).

Notwithstanding the above, the Third Circuit Court of Appeals only allows a limitations defense to be raised in a Rule 12(b)(6) motion "if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Stephens v. Clash*, 796 F.3d 281, 288 (3d Cir. 2015). "Thus, a district court may grant a motion under Rule 12(b)(6) raising a limitations defense 'if the face of the complaint' demonstrates that the plaintiff's claims are

untimely." *Id.* (quoting *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014)). However, "if 'the pleading does not reveal when the limitations period began to run,' then 'the statute of limitations cannot justify Rule 12 dismissal.'" *Id.* (quoting *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 835 (3d Cir. 2011)).

In the instant matter, Rakuten Baseball raising the statute of limitations defense is premature because the face of Plaintiff's Complaint does not reveal when the limitations period began to run. It is unclear from the Complaint when Plaintiff knew that he a cognizable injury. Rakuten Baseball's assertion that December 24, 2014 (the date when Plaintiff was informed by Rakuten Baseball that he would not be given a contract for the 2015 season) is the accrual date is yet to be seen. First, although December 24, 2014 is when Plaintiff was made aware that Rakuten Baseball did not intend to resign him, Plaintiff was not released from the Golden Eagles' "Reserve List" until January 5, 2015; at which time he became free to speak with other professional baseball teams concerning a potential contract. Because Plaintiff was free to speak with other teams after his discussions with Rakuten Baseball, his Complaint is unclear as to whether he knew he had a cognizable injury at the time Rakuten Baseball refused to resign him. Secondly, the Complaint does not set forth the date in which Plaintiff signed with the Doosan Bears of the Korean Baseball Organization. Third, Plaintiff's Complaint alleges that Rakuten Baseball and Plaintiff continued to communicate about Rakuten

Baseball's rejection of the final agreement signed by Plaintiff as late as July 10, 2017. ECF No. 1 at ¶ 65. These are examples of how this Court cannot dismiss Plaintiff's fraud and negligent misrepresentation claims at this stage for failure to adhere to the statute of limitations. Discovery is needed to further explore the statute of limitations issue, which Rakuten Baseball can reargue at the dispositive motion stage.

### 2. *Fraud and Negligent Misrepresentation*

As mentioned above, Plaintiff's first and second causes of action contained in his Complaint are fraud and negligent misrepresentation. Under Pennsylvania law, a plaintiff needs to show six elements to prove fraud: "(1) a representation which is (2) material to the transaction at hand, (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false, and (4) made with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) that the resulting injury was proximately caused by the reliance." *Shuker*, 885 F.3d at 778 (internal quotations omitted) (quoting *Gibbs*, 647 A.2d at 889). When a plaintiff alleges fraud in his complaint, the plaintiff "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a plaintiff's complaint "must allege 'the date, time and place of the alleged fraud or otherwise inject

precision or some measure of substantiation into a fraud allegation' and must state 'the circumstances of the alleged fraud with sufficient plausibility to place the defendant on notice of the precise misconduct with which it is charged.'" *Shuker*, 885 F.3d at 778 (quoting *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)).

The elements for negligent misrepresentation are: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Gongloff Contracting, L.L.C. v. L. Robert Kimball & Assocs., Architects & Engineers, Inc.*, 2015 Pa. Super. 149, 119 A.3d 1070, 1076 (2015) (internal quotations omitted) (quoting *Bilt-Rite v. The Architectural Studio*, 581 Pa. 454, 886 A.2d 270, 277 (2005)). "[T]he misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words." *Id.* (internal quotations omitted) (quoting *Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 561 (1999)). To establish a valid claim for negligent misrepresentation, the plaintiff must show a "negligent statement regarding a present, material fact." *Bennett v. Itochu Intern., Inc.*, 682 F. Supp. 2d 469, 480 (E.D. Pa. 2010). The statement must concern a present fact because a "speaker cannot be negligent as to his future

intentions." *Id.* "The misrepresentation must therefore be that the promissor is falsely declaring that he has the intent to perform. If the promissor intends not to perform, however, the misrepresentation (that the promissor intends to perform) is not negligent, it is, rather, knowing and intention." *Id.* at 481 (internal quotations omitted) (quoting *Addie v. Kjaer*, 2009 WL 453352 (D. Vi. Feb. 23, 2009)).

In the instant matter, Plaintiff's causes of action for fraud and negligent misrepresentation are sufficiently pled and the same facts concern both claims. First, Plaintiff pled that Sasaki, on behalf of Rakuten Baseball, sent his agent the final agreement for him to sign via email. This final agreement, and the emails between Sasaki and Plaintiff's agent pertaining to the sending of the final agreement (which was created and approved by Rakuten Baseball), allege a misrepresentation of a present material fact by Rakuten Baseball of its intention to resign Plaintiff to a contract. At this stage of the litigation, Plaintiff's Complaint adequately pleads that Rakuten Baseball had the present intention of resigning him when they sent him a finalized contract to sign that was represented to be the clean copy of the final agreement. Taking Plaintiff's allegations as factually true, Rakuten Baseball clearly intended Plaintiff to rely on this material fact in order to have him sign the contract. Plaintiff sufficiently pled that he relied on this misrepresentation by buying a new home on the premise that he believed that he had resigned with the Golden Eagles for the 2015 season. For the fraud claim,

these allegations are pled with sufficient heightened particularity. For the facts

pertaining to Rakuten Baseball's mindset to establish the requisite knowledge or

intent, these facts are sufficiently pled, as they only need to be pled generally. In

satisfying Rule 9(b), the facts in Plaintiff's Complaint put Rakuten Baseball on

notice of the precise misconduct for which it is charged.

### 3. *Promissory Estoppel*

Plaintiff's third, and final, cause of action is promissory estoppel. To

establish a claim for promissory estoppel, a plaintiff must show that "1) the

promisor made a promise that he should have reasonably expected to induce action

or forbearance on the part of the promisee; 2) the promisee actually took action or

refrained from taking action in reliance on the promise; and 3) injustice can be

avoided only by enforcing the promise." *Gutteridge v. J3 Energy Group., Inc.*,

2017 Pa. Super. 150, 165 A.3d 908, 919 (2017) (quoting *Crouse v. Cyclops

Industries*, 560 Pa. 394, 745 A.2d 606, 610 (2000)). "[P]romissory estoppel makes

otherwise unenforceable agreements binding, [therefore], the doctrine sounds in

contract law . . . ." *Crouse*, 165 A.2d at 610. For the first element, the promise

must be an express promise and the allegation of a "broad and vague implied

promise" would not suffice. *C&K Petroleum Products, Inc. v. Equibank*, 839 F.2d

188, 192 (3d Cir. 1988).

Here, Plaintiff's Complaint sufficiently pled the cause of action of promissory estoppel, as well. Although there is no allegation that Rakuten Baseball specifically said to Plaintiff "we promise," based on the totality of the circumstances, a fact finder could conclude that Rakuten Baseball made an express promise to Plaintiff when it sent Plaintiff's agent the final agreement of a contract for the 2015 season for Plaintiff to sign. Through the sending of the final agreement, in conjunction with the extensive negotiations and contract drafts that went between the parties, it can be inferred by a fact finder that Rakuten Baseball expressly promised Plaintiff that it will resign him for the 2015 season, as long as he signed and approved the final agreement. Plaintiff took action on this promise by buying a new house with the understanding that he would pay for it with the money earned from the contract. The facts alleged in Plaintiff's Complaint sufficiently demonstrate that it is plausible that Plaintiff can recover damages against Rakuten Baseball under a promissory estoppel theory. Therefore, Plaintiff's Complaint sufficiently states a claim for promissory estoppel.

## IV. CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss is granted in part and denied in part. This Court has personal jurisdiction over Rakuten Baseball, but it does not have personal jurisdiction over Rakuten; therefore, Rakuten is dismissed. Secondly, Plaintiff's claims have been sufficiently pled, allowing his

causes of action to proceed to discovery. Rakuten Baseball must file an answer to Plaintiff's Complaint on or before May 6, 2019. An appropriate order from the Court in conjunction with this Memorandum to follow.

**BY THE COURT:**

Dated: 4-22-2019

CHAD F. KENNEY, JUDGE